UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AHMED DLAWAR MUSHEER,<br><br>                              Petitioner,<br><br>v.<br><br>CHRISTOPHER J. LAROSE, Senior Warden, Otay Mesa Detention Center, San Diego, California, et al.,<br><br>                              Respondents. | Case No.:  3:26-cv-01780-RBM-MSB<br><br>**ORDER GRANTING IN PART PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**[Doc. 1]** |

Pending before the Court is Petitioner Ahmed Dlawar Musheer's ("Petitioner") Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2241.  (Doc. 1.) For the reasons set forth below, the Petition is **GRANTED in part**.  The Court will order a new bond hearing, but not immediate release.

## I.      BACKGROUND

**A.      Factual Background**

Petitioner is a citizen of Iraq who was admitted to the United States on a B1/B2 visitor's visa on November 7, 2023.  (*Id.* ¶ 21.)  He filed for asylum with United States Citizenship and Immigration Services ("USCIS") on January 2, 2024.  (*Id.*)  On March 26, 2024, Petitioner married his wife, a United States citizen.  (*Id.* ¶ 22.)  Seven months later, on November 7, 2024, Petitioner applied for adjustment of status with USCIS.  (*Id.*)  On June 9, 2025, Petitioner and his wife attended an interview at the San Diego Field Office related to his adjustment of status application.  (*Id.*)  His application remains pending.  (*Id.*)

On February 19, 2026, Petitioner was detained by immigration officers in the parking lot of his apartment complex. (*Id.* ¶ 26; *see also* Doc. 1-5 at 5.) He was then transferred to Otay Mesa Detention Cetner, where he remains. (Doc. 1 ¶ 26.)

Petitioner submitted a motion in support of bond redetermination, arguing that he did not pose a danger or flight risk and submitting the following evidence: a sponsor letter, sponsor financial documentation, proof of his pending asylum and adjustment applications, and proof of his *bona fide* marriage. (*Id.* ¶ 27.) On March 4, 2026, Petitioner received a bond hearing before an immigration judge ("IJ"). (*Id.* ¶ 28; *see also* Doc. 1-3 at 2–11.) Petitioner was represented at the bond hearing by different counsel than his counsel in the proceedings before this Court. (*See* Doc. 1 ¶ 28.) On the day of the hearing, the United States Department of Homeland Security ("DHS") also submitted its evidence in the form of Petitioner's Notice to Appear, which charged Petitioner with overstaying his visitor's visa without DHS authorization. (*Id.*; *see also* Doc. 1-5 at 5–7.) The IJ reviewed both Parties' evidence before the bond hearing. (Hearing Trans. at 3.)

The Parties agreed that Petitioner bore the burden of establishing that he did not pose a danger to the community or a flight risk. (Hearing Trans. at 2.) The IJ also, at the outset of the hearing, indicated that Petitioner "through counsel waives the assistance of an Arabic interpreter for today's hearing." (*Id.*) Petitioner argued that he was not a flight risk or danger because he had no criminal history, had pending applications with USCIS, had attended all his required USCIS appointments, was married to his United States citizen wife and had other strong family ties to the United States, and had his step-nephew agree to be a sponsor. (*Id.* at 4–5.) The IJ then asked Petitioner about the basis for his asylum claim and whether he sought a visa to come to the United States while in Iraq or outside Iraq. (*Id.* at 5.) Petitioner's counsel represented that she "d[id] not have that [answer] in full detail" and that she "d[id] not speak his native tongue." (*Id.*) The IJ then, with Petitioner's counsel's permission, questioned Petitioner directly in Arabic:

> IJ: Do you mind if I ask him [where he sought the visa] directly? I speak Arabic.

2

3:26-cv-01780-RBM-MSB

Atty Duran: Sure.

[IJ and [Petitioner] converse for several minutes in Arabic.]

IJ: So, Counsel, I'll explain what I asked him.  I was asking him where he was when he applied for his visa to come to the United States.  He stated that he applied in approximately October of 2023, and was in Baghdad, Iraq.  It was not outside of Iraq.

He did tell me that he has extensively traveled outside of Iraq.  He has traveled to approximately 20 countries, including countries in Europe.  He mentioned Lebanon, Cyprus, Turkey, Egypt, Holland, Austria, Germany, and Greece.

Most recently, he traveled in March of 2023 to Greece, Austria, Germany, and Belgium.  I just want to make sure he didn't tell me anything else.  All right. So, do you have any concerns with the court communicating directly with your client regarding this issue?

Atty Duran: No, as long as it is translated into the court [sic] and is submitted into the record.

IJ: It's part of the record, Counsel.

(Hearing Trans. at 5–6.)

DHS counsel then argued that Petitioner was a flight risk: "even though he came here in November 2023 and he married shortly [sic], it's a little suspicious the fact that he married so quickly after getting to the United States. . . .  The fact that USCIS has not approved that application also might be a matter of concern . . . .  Also, the income of [Petitioner] is pretty low. . . ." (Hearing Trans. at 6.)  After hearing arguments, the IJ found that Petitioner had not met his burden:

The court is going to find that he is a flight risk, and I'll explain the court's reasoning. [Petitioner] explained to the court that he has traveled extensively to approximately 20 countries, including countries in Europe, most recently in March of 2023.  So, it's evident to the court that he's been able to leave his country of Iraq and return to it and has been able to travel extensively, as noted by the court.

So, the court calls into question the asylum-related relief, the asylum

3

application he filed with USCIS.  It doesn't appear that [Petitioner] filed for asylum in these countries that he visited.  But again, the court does not have that information, but I would assume counsel would have informed the court if he did file for asylum elsewhere.

So, that undermines his travel.  International travel does undermine his claim for asylum and fear of returning to Iraq when he was able, essentially, to freely exit and reenter his country.  As to his marriage to a United States citizen, it occurred approximately between two and three months after he entered the United States as a non-immigrant visitor, which calls into question the legitimacy of the marriage, given how quickly it occurred. . . .

His family in the United States is not his immediate family based on blood. Rather, it's based on his marriage to his spouse.  So, he has a spouse, his spouse's daughter, and then a step-nephew, which is essentially the nephew of his spouse.

So, other than that, he doesn't have family members of his own outside of the marriage.  He did tell the court that he applied for a visa to come to the United States in October of 2023, and he was within his country of Iraq when he did that.  As government counsel points out, [Petitioner's] joint tax return reflects an income that's likely below the federal poverty guidelines.

However, it appears the step-nephew would step in as a sponsor with his income.  The court's greatest concern really is the lack of viable relief [Petitioner] may have.  The court, as noted, has called into question his application for asylum with USCIS.

And then [Petitioner], one moment, please.  He did file an adjustment in I-130 packet with USCIS.  Give me a moment to look at the date. That was filed November 7, 2024.  He did attend his interview and was given an RFE, a request for evidence, and then detained by DHS a couple days later.  The reality is his I-130 is not approved.

So, without that approval, he's not eligible for adjustment of status before the court or for consular processing from abroad. So, at this stage, his relief is limited.  It's questionable as to his I-589 doesn't have an approved I-130 for adjustment or consular processing [sic].

So, essentially, if his asylum relief is denied before the court, he would be left essentially with voluntary departure, which is a very limited form of relief.

3:26-cv-01780-RBM-MSB

So, based on the court's reasoning as stated on the record, I am going to find that he is a flight risk and that there's no amount of bond that would mitigate that risk.

(Hearing Trans. at 8–10.)

## B.      Procedural Background

Petitioner filed his Petition on March 20, 2026.  (Doc. 1.)  The Court set a briefing schedule shortly thereafter.  (Doc. 2.)  On March 30, 2026, Respondents filed their Return to Habeas Petition.  (Doc. 6.)  On April 1, 2026, Petitioner filed his Traverse in Support of Petition.  (Doc. 7.)  Petitioner also filed Notices of Supplemental Authority on April 21 and May 20, 2026.  (Docs. 8, 9.)

## II.      LEGAL STANDARD

A writ of habeas corpus is "available to every individual detained within the United States."  *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (citing U.S. Const., Art. I, § 9, cl. 2).  "The essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody."  *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973).  "Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions."  28 U.S.C. § 2241(a).  The petitioner bears the burden of demonstrating that "[h]e is in custody in violation of the Constitution or laws or treaties of the United States."  *Id.* § 2241(c)(3).

The Court's "review of an immigration judge's determination of flight risk is for abuse of discretion."  *Soriano v. Hernandez*, — F. Supp. 3d —, 2026 WL 969764, at *4 (W.D. Wash. Apr. 10, 2026) (citing *Martinez v. Clark*, 124 F.4th 775, 779, 784–85 (9th Cir. 2024)).  The same is true of the Court's review of "constitutional challenges to an IJ's detention determination."  *Loba L.M. v. Andrews*, No. 1:25-CV-00611-JLT-SAB, 2026 WL 710307, at *5 (E.D. Cal. Mar. 13, 2026) (citing *Martinez*, 124 F.4th at 784).  Abuse of discretion review "does not involve 'reweigh[ing] evidence' but rather determining whether the IJ 'applied the correct legal standard.'"  *Perez Velasquez v. Bondi*, Case No.:

26-cv-01759-GPC-DDL, 2026 WL 1042479, at *5 (S.D. Cal. Apr. 16, 2026) (quoting *Martinez*, 124 F.4th at 784). "[T]he reviewing court must bear in mind that 'the government's discretion to incarcerate non-citizens is always constrained by the requirements of due process.'" *Id.* (quoting *Martinez*, 124 F.4th at 784).

### III.   DISCUSSION

Petitioner argues that the bond hearing did not comply with due process because: (1) the IJ ignored Petitioner's evidence and relied on "unsupported speculation about relief eligibility and unsubstantiated allegations of potential misrepresentation;" (2) the IJ "inappropriately obtain[ed]. . . information by conversing directly with [Petitioner] in Arabic without the aid of an interpreter," thereby precluding Petitioner's counsel from asking any follow-up questions or responding to the IJ's concerns; and (3) the IJ was not a neutral arbiter. (Doc. 1 ¶¶ 64–92.) Respondents' main argument is that Petitioner should be required to exhaust administrative remedies. (Doc. 6 at 2–6.) The Court finds that: (1) exhaustion should be waived; (2) the IJ erred by questioning Petitioner directly in Arabic without an Arabic interpreter present; and (3) the error prejudiced Petitioner.

**A.   Exhaustion**

Habeas claims are accompanied by a prudential exhaustion requirement. *Hernandez v. Sessions*, 872 F.3d 976, 988 (9th Cir. 2017). Exhaustion is prudentially required where:

> (1) agency expertise makes agency consideration necessary to generate a proper record and reach a proper decision;
>
> (2) relaxation of the requirement would encourage the deliberate bypass of the administrative scheme; and
>
> (3) administrative review is likely to allow the agency to correct its own mistakes and to preclude the need for judicial review.

*Id.* (quoting *Puga v. Chertoff*, 488 F.3d 812, 815 (9th Cir. 2007)).

"If a petitioner fails to exhaust prudentially required administrative remedies, then 'a district court ordinarily should either dismiss the petition without prejudice or stay the proceedings until the petitioner has exhausted administrative remedies.'" *Hernandez*, 872

3:26-cv-01780-RBM-MSB

F.3d at 988 (quoting *Leonardo v. Crawford*, 646 F.3d 1157, 1160 (9th Cir. 2011)).  But a district court may waive the prudential exhaustion requirement if "administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void." *Laing v. Ashcroft*, 370 F.3d 994, 1000 (9th Cir. 2004) (citations omitted).

Here, even if the *Puga* factors weighed in favor of exhaustion, Petitioner has demonstrated that the Court should waive exhaustion because one of the exceptions—irreparable injury—is present.  Respondents argue that "detention alone is not an irreparable injury" sufficient to waive exhaustion.  (Doc. 14 at 5 (citing *Reyes v. Wolf*, No. C-20-0377-JLR, 2021 WL 662659, at *3 (W.D. Wash. Feb. 19, 2021), *aff'd sub nom. Diaz Reyes v. Mayorkas*, 2021 WL 3082403 (9th Cir. July 21, 2021)).)  Although the Court agrees with that proposition generally, it has found waiver appropriate in circumstances similar to those here.  *See Hussain v. LaRose*, Case No. 3:26-cv-00194-RBM-MSB, ECF No. 24 (S.D. Cal. June 22, 2026); *Perez Velasquez*, 2026 WL 1042479, at *4 (collecting cases waiving exhaustion in similar circumstances); *Tiboko-Tifuh v. Noem*, Case No. 26-cv-1215-JO-DEB, 2026 WL 1603795, at *3–4 (S.D. Cal. June 4, 2026) (waiving exhaustion because requiring BIA review of the bond denial "would likely result in weeks or months of further detention and perpetuate the very harm the Court's order was designed to prevent"); *Soriano*, 2026 WL 969764, at *4 (same); *Hechavarria v. Whitaker*, 358 F. Supp. 3d 227, 237 (W.D.N.Y. 2019) ("because of delays inherent in the administrative process, [further] BIA review would result in the very harm that the bond hearing was designed to prevent: 'prolonged' detention without due process during lengthy and backlogged removal proceedings") (citation omitted).

Additionally, Petitioner represents that he "suffers from a rare and serious genetic condition, coronary artery dissection, which . . . requires continuous medical monitoring and follow up care." (Doc. 1 ¶ 24.)  As such, "Petitioner has presented evidence unique to him, that, while not an independent basis for relief, supports a finding that his continued detention pending a potentially months-long BIA appeal of the IJ's bond denial decision

would risk continued irreparable harm." *W.T.M. v. Bondi*, Case No. 2:25-cv-02428-RAJ-BAT, 2026 WL 262583, at *3 (W.D. Wash. Jan. 30, 2026); *see also Zarei v. LaRose*, Case No.: 26-cv-02335-GPC-MMP, 2026 WL 1415042, at *4 (S.D. Cal. May 19, 2026) ("Specifically, Petitioner cites his poor mental and physical health . . . . These conditions could risk continued irreparable harm if detention is sustained.").

Therefore, although continued detention alone may not constitute irreparable injury, Petitioner faces continued detention, as his health worsens, subject to lengthy delays in the BIA appeals process and arising out of a potentially constitutionally deficient bond hearing. The Court thus finds that Petitioner has demonstrated irreparable injury and that waiving exhaustion is appropriate.

**B.      Constitutional Sufficiency of the Bond Hearing**

Petitioner argues that the bond hearing was constitutionally deficient because the IJ ignored Petitioner's evidence and relied on conjecture, inappropriately obtained information by questioning Petitioner directly in Arabic, and was not neutral. (Doc. 1 ¶¶ 64–92.) Because the IJ erred by questioning Petitioner in Arabic, and because that error was prejudicial, the Court finds that Petitioner must receive another bond hearing. In light of that conclusion, the Court does not reach Petitioner's other arguments.

The Court analyzes a due process claim in three steps. First, it asks whether a protected liberty interest exists. *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989). Second, it asks "whether the procedures attendant upon that deprivation were constitutionally sufficient." *Id.* And third, it asks whether Petitioner was prejudiced by the alleged due process violation. *Perez-Lastor v. INS*, 208 F.3d 773, 780 (9th Cir. 2000).

**1.      Liberty Interest**

At the first step, Petitioner's interest in receiving a bond hearing that comports with due process is "'fundamental:' freedom from imprisonment is at the 'core of the liberty protected by the Due Process Clause.'" *Hernandez*, 872 F.3d at 993 (quoting *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)). "There should be no reasonable dispute that Petitioner has a strong liberty interest to be free from prolonged detention without a [constitutionally

sufficient] hearing." *Zagal-Alcaraz v. ICE Field Office*, Case No. 3:19-cv-01358-SB, 2020 WL 1862254, at *7 (D. Or. Mar. 25, 2020) (citing *Singh v. Barr*, 400 F. Supp. 3d 1005, 1021 (S.D. Cal. 2019)).

### 2.    Procedures

At the second step, to determine which procedures are constitutionally sufficient, the Court applies the three-part test in *Mathews v. Eldridge*, 424 U.S. 319 (1976).  The Court considers: (1) "the private interest that will be affected by the official action;" (2) the "risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Id.* at 335.

First, as noted above, Petitioner's interest in receiving a bond hearing that comports with due process is "fundamental."  *Hernandez*, 872 F.3d at 993.  Second, the procedures employed by the IJ during the bond hearing increased the risk of an erroneous deprivation of his liberty interest.  In the typical case alleging a due process violation based on an interpretation error, the petitioner argues that he was unable to understand or participate in the proceedings because his interpreter was incompetent.  *See Perez-Lastor*, 208 F.3d at 773.  The instant case presents almost the inverse: because the IJ questioned Petitioner in a language that no one else in the courtroom could understand, only Petitioner was able to understand and participate in the proceedings.  The IJ's decision to question Petitioner in Arabic without the presence of an Arabic interpreter, after noting that Petitioner had waived the assistance of an Arabic interpreter, deviated from her "duty to develop the record fully and fairly."  *Kaur v. Ashcroft*, 388 F.3d 734, 737 (9th Cir. 2004) (citation omitted).  It also deviated from standard immigration court policy, as "[i]nterpreters in immigration proceedings must meet certain proficiency standards and swear to translate accurately." *United States v. Valdivias-Soto*, 112 F.4th 713, 734 n.2 (9th Cir. 2024) (Ikuta, J., dissenting) (citing Dep't of Just., EOIR Language Access Plan, https://www.justice.gov/sites/default/files/eoir/legacy/2012/05/31/EOIRLanguageAccess

3:26-cv-01780-RBM-MSB

Plan.pdf (providing that interpreters must have at least a year of experience translating in judicial settings and must pass an exam)).  Nothing in the record suggests that the IJ met these proficiency standards, nor that she was permitted to serve in the dual positions of judicial officer and interpreter in the same hearing.  Accordingly, the Court finds that the IJ erred by questioning Petitioner in Arabic and then summarizing the conversation into English on the record without the presence of a competent interpreter.

Third, the Court must afford significant weight to the government's interest in the "efficient administration of the immigration laws at the border" and the well-settled fact that "control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature." *Landon v. Plasencia*, 459 U.S. 21, 34 (1982). The government also has an interest, though, in "the integrity and accuracy of administrative proceedings in which those interests are furthered." *Najjar v. Reno*, 97 F. Supp. 2d 1329, 1356 (S.D. Fla. 2000), *vacated on other grounds by Al Najjar v. Ashcroft*, 273 F.3d 1330 (11th Cir. 2001) (citing *Bridges v. Wixon*, 326 U.S. 135, 153 (1945) (describing the rules governing immigration proceedings as "safeguards against essentially unfair procedures")).  These are both weighty and competing interests.  But the Court must also consider "the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.  And bond hearings with interpreters are routine and impose a minimal cost on the government.  *See Doe v. Becerra*, 787 F. Supp. 3d 1083, 1094 (E.D. Cal. 2025).  Therefore, this factor favors Petitioner. Because the *Mathews* factors favor Petitioner, the Court finds that the IJ erred by questioning Petitioner directly in Arabic without using an Arabic interpreter.

### 3.    Prejudice

At the third step, the Court considers whether the error prejudiced Petitioner.[1]

---

[1] Determining whether the error prejudiced the petitioner is typically a step in a court's analysis of an incompetent translation claim.  *See Hussain v. LaRose*, Case No. 3:26-cv-00194-RBM-MSB, ECF No. 24 at 12 (S.D. Cal. June 22, 2026) (citing *Perez-Lastor*, 208

10

3:26-cv-01780-RBM-MSB

Petitioner argues he was prejudiced by the direct questioning:

> Notwithstanding [Petitioner's bond hearing counsel's] agreement to this questioning, it was inappropriate of [the IJ] to even make such a request, given that she had [Petitioner's bond hearing counsel] waive the presence of an Arabic interpreter at the outset of the hearing, which signaled that the IJ did not intend to question [Petitioner]. . . .  Further, by questioning [Petitioner] without an interpreter, [Petitioner's bond hearing counsel] was precluded from asking any follow-up questions, as she stated for the record that she does not speak Arabic and obviously the [IJ] could not act as an interpreter. Further, although [the IJ] indicated that she intended to ask where [Petitioner] had applied for his visa (a fact already in the record) she took advantage of the opportunity and asked him additional questions and then utilized his responses to deny bond.

(Doc. 1 ¶ 30 n.5.)

A noncitizen "suffers prejudice if the violation potentially affects the outcome of the proceedings." *Perez-Lastor*, 208 F.3d at 780 (cleaned up).  "This standard is onerous, but not insurmountable." *Id.*

The IJ found that Petitioner had not met his burden of establishing that he was not a flight risk because: (1) "it's evident to the court that he's been able to leave his country of Iraq and return to it and has been able to travel extensively," which "calls into question the asylum-related relief;" (2) all of Petitioner's family ties in the United States are based on his marriage, rather than his blood relationships; and (3) the circumstances surrounding his

---

F.3d at 780).  As discussed above, this is not a typical incompetent translation claim.  Still, the Court finds it appropriate to analyze prejudice.  Courts considering alleged due process violations arising from analogous interpretation errors require the movant to establish that he was prejudiced.  For example, a court in this District rejected a criminal defendant's argument that his judgment should be vacated because the interpreters were not sworn in at the plea colloquy and sentencing.  *See United States v. Rodriguez-Barrera*, Nos. 12cv00760 BTM, 10cr04190, 2013 WL 593421, at *5 (S.D. Cal. Feb. 13, 2013).  The court explained that, even if the failure to swear in the interpreters under Federal Rule of Evidence 604 was error, the error was not prejudicial.  *Id.*  Similarly, here, even if the IJ's failure to use a certified interpreter under the relevant EOIR policy was error, Petitioner must show prejudice to succeed.

3:26-cv-01780-RBM-MSB

marriage made the IJ question the validity of his marriage, as well as "what he represented to U.S. officials in seeking his visa." (Hearing Trans. at 7–10.)  The IJ's "*greatest concern*" was "the lack of viable relief that [Petitioner] may have" considering how the court "called into question [Petitioner's] application for asylum with USCIS."  (*Id.* at 9 (emphasis added).)

The IJ's concerns regarding Petitioner's asylum application appear to be based entirely on the information she learned about his international travel; that information was not in the documentary record but came to light only through the conversation the IJ had directly with Petitioner in Arabic.  (*See* Hearing Trans. at 5.)  As Petitioner notes, Petitioner's counsel was unable to respond to the IJ's concerns, or to question Petitioner herself, because Petitioner's counsel did not speak Arabic and there was no Arabic interpreter. (Doc. 1 ¶ 30 n.5.)  Petitioner was thus unable to respond to the basis of the IJ's "greatest concern" regarding Petitioner's risk of flight.  Under these circumstances, the Court concludes that the IJ's error may have "potentially affect[ed] the outcome" of the bond hearing.  *Perez-Lastor*, 208 F.3d at 780 (finding prejudice where the petitioner was "prevented . . . from explaining to the IJ why he did not provide a Quiche or Spanish language version of the declaration" and from responding to "three of the reasons given by the BIA for sustaining the IJ's adverse credibility finding").

**C.    Remedy**

Having concluded that the IJ's error prejudiced Petitioner, the Court next considers the appropriate remedy.  "Federal courts have a fair amount of flexibility in fashioning specific habeas relief." *Burnett v. Lampert*, 432 F.3d 996, 999 (9th Cir. 2005).  Petitioner argues that immediate release is the proper remedy. (Doc. 1, Prayer for Relief.)  The Court disagrees and finds that the proper remedy is a new bond hearing, before a different IJ, where the translated testimony given at the March 4, 2026 bond hearing shall not be considered as evidence in light of the due process violation.  *See Perez-Lastor*, 208 F.3d at 783 (remanding to the BIA with substantially these same instructions); *Kumar v. Noem*, No. 1:26-cv-01148-DJC-AC, 2026 WL 983129, at *4 (E.D. Cal. Apr. 13, 2026) (waiving

exhaustion and ordering the government to provide a second bond hearing to a noncitizen after finding the first bond hearing deficient).

### IV.    CONCLUSION

For the reasons above, the Petition (Doc. 1) is **GRANTED in part**.  To the extent Petitioner requests immediate release, the Petition is **DENIED**.  The Court **ORDERS**:

1. The Government **SHALL arrange** a new individualized bond hearing for Petitioner **within fourteen (14) days** of entry of this Order—unless the noncitizen requests a continuance—to determine whether his continued detention is warranted.

2. The Government **SHALL arrange** for a certified Arabic interpreter to interpret at the new bond hearing.

3. Because the Parties previously agreed that the noncitizen was to bear the burden of proof at the bond hearing, the noncitizen shall bear the burden of proof at the new bond hearing.

4. The new bond hearing shall be overseen by **a different immigration judge**.

5. The testimony elicited by the IJ by speaking directly to Petitioner in Arabic at the March 4, 2026 bond hearing **shall not be considered as evidence** at the new bond hearing.  This Order, of course, does not preclude the new IJ from independently raising the issue at the new bond hearing.  *See Perez Velasquez*, 2026 WL 1042479, at *5 ("an IJ may consider any evidence in the record . . . when assessing flight risk, provided that such evidence is probative and specific"); *Hussain*, 3:26-cv-00194-RBM-MSB, ECF No. 24 at *13 (describing IJ's broad discretion regarding testimony at bond hearings) (citations omitted).

**IT IS SO ORDERED.**

DATE:  July 14, 2026

HON. RUTH BERMUDEZ MONTENEGRO
UNITED STATES DISTRICT JUDGE

13

3:26-cv-01780-RBM-MSB